IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VIA CHRISTI REGIONAL MEDICAL CENTER, INC., successor-in-interest to ST. JOSEPH MEDICAL CENTER, INC., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-1026-WEB |
| | ) | |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## Memorandum and Order

The plaintiff brought this action for review of a final decision of the Secretary of Health and Human Services.  *See* 42 U.S.C. § 1395oo(f)(1).  The dispute centers on a claim by the St. Joseph Medical Center, Inc. ("St. Joseph") for reimbursement of approximately $9.7 million from the Medicare program.  Relying on regulations that require the Secretary to reimburse hospitals for costs incurred in providing Medicare-covered services, St. Joseph claimed the reimbursement in connection with its 1995 consolidation with St. Francis Regional Medical Center, a transaction that resulted in the creation of the Via Christi Regional Medical Center.  St. Joseph claimed it incurred a significant loss on the disposition of its assets in the transaction, and it argued the Secretary was obligated to reimburse it for a portion of the loss.  The Secretary rejected the claim on the grounds that the consolidation was between "related parties" and also was not a "bona fide sale" within the meaning of the Medicare regulations.  The parties have now filed cross-motions for summary judgment.  The court finds that oral argument would not assist in deciding the issues presented.

I.  *Background*.

A.  Overview of Regulations.

Under the Medicare Act, the Secretary reimburses hospitals for the reasonable cost of providing covered health care services to Medicare patients.  42 U.S.C. § 1395f(b)(2).  Reasonable cost means "the cost actually incurred," excluding anything unnecessary for the efficient delivery of needed health services, and determined in accordance with the Secretary's regulations.  42 U.S.C. § 1395x(v)(1)(A).

The Secretary has promulgated extensive regulations for determining reasonable cost reimbursement.  *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 92 (1995).  Among other things, an appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost.  42 CFR § 413.134(a) (1995).[1]  The portion of such depreciation expense borne by Medicare is based in part on the degree to which the assets have been used to serve Medicare beneficiaries.

The system of providing reimbursement for depreciable assets results in those assets having a "net book value" for Medicare purposes, which is typically the historical cost of the asset less depreciation previously paid to the provider.  *See* 42 CFR § 413.134(b)(9).  Under the Secretary's regulations, when a hospital disposes of a depreciable asset for more or less than its net book value, "an adjustment is necessary in the provider's allowable cost."  *Id*. § 413.134(f).  For example, when an asset is sold for more than book value, the provider is considered to have incurred a gain on the

---

[1] All of the citations herein refer to the 1995 version of the Code of Federal Regulations, since that version was in effect at the time of the consolidation at issue.  It should be noted that the law and the regulations were substantially revamped subsequent to 1995.  Among other changes, they now provide that no gain or loss is recognized on the sale of assets on or after December 1, 1997.  *See* 42 CFR § 413.134(f)(1) (2006).

asset, and the Secretary can "recapture" from this gain depreciation payments previously made. Conversely, if the provider sells the asset for less than book value, the provider is considered to have incurred a loss, and the Secretary provides additional reimbursement to the provider. *See St. Mark's Charities Liquidating Trust v. Shalala*, 141 F.3d 978, 980 (10th Cir. 1998). *See also* 44 Fed. Reg. 3980 (1979) ("[I]f a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care."); 42 U.S.C. § 1395x(v)(1)(A) (1995) (the Secretary shall provide for suitable retroactive corrective adjustments where the aggregate reimbursement produced by methods of determining costs proves to be either inadequate or excessive).      The primary regulation at issue here is 42 CFR § 413.134 (1995), concerning "allowance for depreciation based on asset costs."  A subsection of the regulation dealing specifically with gains and losses upon disposal of depreciable assets provides in part that "depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft or other casualty." § 413.134(f)(1). If such disposal results in a gain or loss, "an adjustment is necessary in the provider's allowable cost." *Id*.  The treatment of the gain or loss "depends upon the manner of the disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." *Id*.  Subsection (f)(2), entitled "Bona fide sale or scrapping," provides in part that gains and losses realized from "the bona fide sale" of depreciable assets are included in allowable costs while the provider is participating in Medicare.  In addition to subsection (f)(2), other subsections in this regulation deal with:  bona fide sales within one year after terminating participation in Medicare (f)(3);  exchange, trade-in or donation (f)(4); demolition or abandonment (f)(5); and involuntary conversion (f)(6).

Subsection (g) of § 413.134, entitled "Establishment of cost basis on purchase of facility as

an ongoing operation," provided guidelines on how a purchaser of an ongoing operation would establish the basis of assets acquired in the purchase.  It stated in part that the cost basis for assets of a facility purchased as an ongoing operation would be the lower of the acquisition cost to the new owner or the fair market value of the assets on the date of acquisition.  Additionally, if the purchaser could not demonstrate that the sale was bona fide, the purchaser's cost basis also could not exceed the seller's cost basis,  less accumulated depreciation.  *See also* 42 U.S.C. § 1395x(O)(i) (1995).

The provision at the heart of the current dispute, § 413.134(l),  was entitled "Transactions involving a provider's capital stock."  It addressed three particular types of transactions:  (1) the acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation.  The first subsection, (l)(1),  made clear that a mere purchase of capital stock did not result in any revaluation of assets.  That is,  "if Corporation A purchases the capital stock of Corporation B, the provider, Corporation B continues to be the provider after the purchase and Corporation A is merely the stockholder.  Corporation B's assets may not be revalued." *Id.*  The second subsection, on statutory mergers, noted that a merger was a combination of two or more corporations, with one of the corporations surviving and acquiring the assets and liabilities of the merged corporation by operation of law. § 413.134(l)(2).  This subsection drew a distinction as to mergers between unrelated parties and those between related parties.  If the parties to the merger were unrelated (as defined in § 413.17), the assets of the merged corporation acquired by the surviving corporation "may be revalued in accordance with paragraph (g) of this section," and "[i]f the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses.  The basis of the assets owned by the surviving corporation are unaffected by the transaction."  §

4

413.134(l)(2)(i).  The third provision, subsection (l)(3), defined a consolidation as "the combination of two or more corporations resulting in the creation of a new corporate entity." § 413.134(l)(3). Like the subsection on mergers, this provision made a distinction between unrelated and related parties:  "If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation may be revalued in accordance with paragraph (g) of this section," but if the consolidation is between related parties, "no revaluation of provider assets is permitted."  Unlike the subsection on mergers, this subsection did not expressly state whether the consolidating corporations were subject to subsection (f) concerning gains and losses.

Section 413.17, referenced in subsection (l) above, was entitled "Cost to related organizations."  It provided generally that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization," but are not to exceed the price of comparable such items that could be purchased elsewhere.  42 CFR § 413.17.  It also defined "related to the provider" to mean "that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies." § 413.17(b)(1).  Further, "common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider," and "control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." § 413.17(b)(2) & (b)(3).

The Secretary's payment and audit functions under the Act are contracted out to insurance companies known as fiscal intermediaries, who determine in the first instance the amounts due

providers under the Act.  Each fiscal year, the provider must submit a cost report to the fiscal intermediary showing the costs incurred and the portion of the costs to be allocated to Medicare. The fiscal intermediary then determines any reimbursement due the provider.  If the provider is dissatisfied with the determination, it may obtain a hearing before the Provider Reimbursement Review Board (PRRB).  42 U.S.C. § 1395oo(a).  A PRRB decision becomes final unless the Secretary [acting through the Administrator of the Centers for Medicare and Medicaid Services] elects to review the decision.  § 1395oo(f).  Providers have a right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance or modification by the Secretary.  *Id*.

B.  Claim for Reimbursement.

Prior to the consolidation in this case, St. Joseph Medical Center, Inc., was a non-profit corporation operating a 600-bed acute care hospital in Wichita, Kansas.  The sole member of the corporation was CSJ Health Care System of Wichita, Inc. ("CSJ").  In turn, CSJ's sole member and religious sponsor was the Sisters of St. Joseph of Wichita, a religious order affiliated with the Roman Catholic Church.  A nineteen-person Board governed St. Joseph, with the members of the Board appointed by CSJ.

Prior to the consolidation, St. Francis Regional Medical Center was an 850-bed non-profit hospital.  The St. Francis Ministry Corporation was the parent corporation and sole corporate member of St. Francis Regional Medical Center.  The Ministry Corporation and the Medical Center operated under the sponsorship of the Sisters of the Sorrowful Mothers, also a religious order affiliated with the Catholic Church.

According to testimony of Leroy Rheault, the President and CEO of Via Christi Health System, and formerly the CEO and President of St. Joseph Medical Center, prior to the consolidation

there was a very competitive relationship between the three main hospitals in Wichita -- St. Joseph, St. Francis, and Wesley Medical Center.  He said the long-term prognosis for St. Joseph was not good, in part because the primary insurer in the area, Blue Cross, intended to contract with only two of the three community hospitals.  A.R. at 424.  According to plaintiff's evidence, Wichita "was becoming a two-hospital town with three hospitals."  A.R. at 171-13.  This and other factors meant that St. Joseph, the smallest of the three hospitals, likely would be unable to survive in the Wichita market over the long term.  Rheault said a sale to a third party would not have solved the problem because any purchaser would have been confronted with the same market forces confronting St. Joseph.  Accordingly, the hospital decided that it needed to "find a partner" in the community.  He said the logical choice was St. Francis, because both hospitals were affiliated with the Catholic church and there were a number of "synergies" between them that could result in service benefits and cost savings.  Rheault said that Wesley hospital would not have been a good fit because it had the largest market share in the area and joining with Wesley would have created anti-trust problems. *Id*.

Rheault testified that at some point prior to the consolidation,  the issue of a Medicare loss came up, but it was not a factor in the decision to consolidate.  A.R. at 432.  He testified that the benefit of the Medicare loss would go to Via Christi.  Rheault said getting full value for St. Joseph's assets was not an objective of the transaction; rather, the consolidation was done in order to advance the hospital's ministry.  A.R. at 35.

In May of 1987, the Director of HHS's Payment and Reporting Policy Division, William Goeller, issued an opinion letter in response to an inquiry about the application of Medicare rules, including the adjustment for gains and losses, when two nonprofit hospitals merge or consolidate.

A.R. at 1386.  The Director responded that although subsection (l)(3) referred only to capital stock transactions, the rule applied to non-stock, non-profit providers as well "because the principles involved would be the same."  *Id.*  He further stated that "if the transaction that you have described meets the definition of either a statutory merger or consolidation ... then a revaluation of assets and/or an adjustment to recognize realized gains and losses may occur."  To determine whether a gain/loss adjustment occurs, the Director said, the agency turns to the question of whether the assets will be donated or whether any consideration will be exchanged for them.  If they are donated, no loss adjustment would be allowed.  *Id.*  If they are exchanged for consideration, however, a loss may occur.  "Thus, in a merger or consolidation of non-stock, nonprofit corporations in which the surviving or new corporation assumes debt of the merged or consolidated corporations," the basis of the assets for the new owner would established under the rule and, "[i]n addition, an adjustment to recognize any gain or loss to the merged/consolidated corporations would be required in accordance with regulations section 12 CFR 413.134(f)."  *Id.* at 1387.  "For purposes of calculating the gain or loss, the amount of the assumed debt would be used as the amount received for the assets...."

In June of 1994, a consultant wrote Bruce Oliver, a member of the staff in the HCFA central officer, to inquire about the reimbursement implications of a proposed consolidation of two unrelated non-profit hospitals. A.R. at 1791.  The inquiry specified that "Hospital A" and "Hospital B" were unrelated parties prior to the transaction, but that "Hospital C," the proposed new corporate provider entity, would be governed by a board of directors made of six board members from Hospital A and six board members from Hospital B, such that "Hospital C may be considered to be related to Hospitals A & B."  The inquiry stated that based on section 4502.7 of the Medicare

Interpretive Manual (MIM) and the example therein, the writer concluded that this would constitute a change of ownership triggering recognition of gain or loss because the parties were unrelated prior to the transaction.  A.R. at 1792.  The inquiry further asserted that because each party was unrelated prior to the consolidation, the "consolidation (acquisition) is 'bona fide' as that term in used in the PRM-1, Section 104.14.... The letter sought the agency's input on these and other issues related to the transaction.  In his response of August 24, 1994, the then-Director of the Office of Payment Policy, Charles Booth, stated that "we agree, based on our understanding of the transaction, that it appears to be a consolidation as defined in § 413.134[l](3)(i) requiring a determination of gain or loss under § 413.134(f)...." A.R. at 1789.

In the course of their negotiations, St. Joseph and St. Francis engaged a consultant (the same one referred to in the previous paragraph) to advise them about the impact of the consolidation on Medicare issues, including reimbursement for loss on depreciable assets.  The consultant advised that the proposed merger would likely qualify as a change of ownership triggering reimbursement because St. Joseph and St. Francis were unrelated organizations, but "[t]o further strengthen the case that this transaction is between unrelated organizations," the consultant suggested that approximately one-third of the members of the new board of directors be individuals who were not current board members of either organization.  A.R. at 1802.  At the request of the parties, the consultant subsequently met with Bruce Oliver of the Central Office of the HCFA to obtain an informal opinion about whether the proposed consolidation would allow for reimbursement.  In that meeting, the consultant discussed with Oliver the prior opinion letter from Charles Booth in which Booth had opined that a similar transaction would qualify for reimbursement even though the board of directors of the new organization would consist entirely of board members from the consolidating non-profit

hospitals.  *See* A.R. at 1789-94.  Oliver said he did not agree with that conclusion.  He believed it was necessary to compare the composition of the new board with the boards of the consolidating hospitals.  As the consultant reported, "Oliver believes that if the board of directors of Hospital A or Hospital B have significant influence or control over Hospital C [the new entity], then Hospital A or B would be determined to be related to Hospital C."  A.R. at 1818.  Oliver said he did not know what percentage of board members it would take to qualify as "significant control or influence," but in his opinion a new board with one-third of its members from the board of a consolidating hospital could qualify as such.  The consultant thus informed the parties there was "no definitive answer as to what percentage  is the threshold."  The consultant maintained its opinion that a board with one-third new members would  not constitute significant control or influence, but cautioned that this would be subject to a determination by Medicare and the courts, and that the parties could "strengthen their case" by reducing the number of new board members who were previously board members of the two hospitals.  *Id*.  The consultant also noted that the reservation of significant powers by the corporate members was a concern, because such powers could give the appearance of continued control or ownership "which the Medicare program may use to justify the determination that the consolidation has not resulted in a change of ownership."  *Id*. at 1822.

St. Joseph entered into a Master Plan of Consolidation with St. Francis Medical Center on September 28, 1995.  Effective October 1, 1995, St. Joseph and St. Francis consolidated under the applicable Kansas statute, resulting in the creation of Via Christi Medical Center.  As a result of the consolidation, all of the assets, rights, liabilities, obligations and contingent liabilities of both hospitals passed by operation of law to the new entity, Via Christi Medical Center, and the two consolidating corporations ceased to exist.  The following day, St. Joseph's sole member (CSJ)

consolidated with St. Francis's sole member (St. Francis Ministry Corporation) to create Via Christi Health System, Inc, the sponsor and parent of Via Christi Regional Medical Center.   Upon completion of the consolidation, seven individuals who had been members of St. Joseph's governing Board became members of Via Christi's twenty-three person Board of Directors.

Pursuant to Kansas law, when the consolidation became effective, the separate existence of the constituent corporations ceased to exist and the two became a new corporation.   The new corporation possessed all the powers and rights of each of the constituent corporations, as well as their property and debts.   K.S.A. § 17-6709(a).

In completing its Medicare cost report for 1995, St. Joseph claimed reimbursement resulting from the consolidation.   According to the report, St. Joseph possessed total assets with a book value of $113.8 million.   In consideration for the consolidation, Via Christi assumed St. Joseph's liabilities in the amount of $26.1 million, resulting in a total loss to St. Joseph of about $88 million.   Of the $26.1 million in consideration received,  St. Joseph assigned $12.1 million to its property, plant and equipment, and of that amount $10.9 million was assigned to assets for which Medicare had recognized depreciation.   The Medicare book value of these depreciable assets was $47.7 million; thus, St. Joseph claimed a loss of about $36.8 million on depreciable assets.   St. Joseph sought reimbursement for Medicare's share of this loss, amounting to about $9.7 million.

The fiscal intermediary to whom the cost report was submitted, Blue Cross and Blue Shield Association/ Blue Cross and Blue Shield of Kansas, disallowed the loss claim on the grounds that the transaction "was among related organizations."   It explained that "[w]hen a consolidation occurs that involves a continuity of control between the nonsurviving entities and the new, consolidated entity, the consolidation would be deemed to be between related parties."   A.R. at 1366.   The

intermediary cited regulations 413.17, 413.134[l](3), and 413.17(b)(3). *Id*.

In 1994, prior to this consolidation, the Health Care Financing Administration set up a workgroup to review change-of-ownership ("CHOW") transactions. The review was prompted by concerns about growing Medicare losses from hospitals being sold in the 1990's.

On November 3, 1995, before the CHOW workgroup issued its recommendations (and one month after the St. Joseph consolidation), HCFA's Director of the Bureau of Policy Development received a memorandum requesting advice regarding an $11 million loss claim on a hospital consolidation in the Boston area. HCFA's Boston office proposed to deny the claim on the grounds that the consolidation was between related parties, because the board members of the two consolidating hospitals "were/are essentially the same" as the board of directors for the new entity. A.R. at 1824. As such, the memo stated, the sale should not be considered a bona fide sale. *Id*. The memo noted that if the claim were allowed, Medicare losses in that region alone could easily cost over $100 million. The memo said several regulations relating to the issue were found, but that neither the regulations nor the PRM "provide sufficient detail about how related/unrelated party consolidation determinations should be made." *Id*. The memo recommended the regulations and the provider manual be expanded to cover this issue. In March of 1996, the HCFA Director responded and agreed with the proposed finding that the parties were related because the board of the consolidated entity was comprised of "a significant number" of board members from the non-surviving entities. A.R. at 1826. The Director stated that because "substantially the same individuals controlled the providers both before and after the consolidation," the related organization rule (of § 413.17(b) & (c)) and Chapter 10 of the PRM applied. The Director asserted that an example in section 1011.4 of the PRM, "while factually different from the situation at hand,

illustrates this continuity of control concept." *Id.* The Director agreed with the recommendation to revise the regulations and manual to include additional instructions on mergers and consolidations, and said that until that could be done the HCFA was notifying all regions with a copy of the memo. *Id.* at 1827.

In May of 1996, HCFA received an alert from a fiscal intermediary in Philadelphia warning about increasing hospital mergers and consolidations. It recommended changes in the Medicare laws, regulations and instructions to protect against what it considered to be inappropriate use of Medicare funds to subsidize or fund mergers through reimbursement of artificial losses on sale. A.R. at 1834.

On September 30, 1996, one year after the St. Joseph consolidation, the CHOW Workgroup provided HCFA with regulatory revisions that would define "bona fide sale" to require "reasonable consideration," and would also require disallowance of losses when there was "continuity of control," including when a consolidated entity's governing board included significant representation from the consolidating entities' boards. A.R. at 1842-48.

C. Review by the Provider Reimbursement Review Board (PRRB).

The plaintiff sought review before the PRRB. Among other things, St. Joseph argued the intermediary had improperly relied on Medicare policies developed after the consolidation. St. Joseph noted that the fiscal intermediary cited language from and relied on the CHOW workgroup's proposed revisions, although the provisions did not become effective until after the instant consolidation. St. Joseph argued the Medicare regulation and policies in effect at the time of the transaction required a recognition of gain or loss for a "consolidation between unrelated parties," with the regulatory preamble making clear that the determination was based solely on the

relationship between the consolidating entities, not the relationship between those entities and the newly-created organization.  Even if "continuity of control" were a valid policy, St. Joseph argued, the intermediary improperly applied the policy when it found that St. Joseph maintained the power to significantly influence or direct the activities or policies of Via Christi.  St. Joseph also argued that the "bona fide sale" requirement that applied to asset sales did not apply to consolidations, but that even if it did the standard was satisfied by the fact that the two consolidating hospitals were not related.

The PRRB concluded the consolidation was in fact between unrelated parties and that § 143.134(l)(3)(i) required a recognition of the loss arising from the transaction.  It said the language of the regulation was "crystal clear that the related party concept will be applied to the entities that are consolidating" rather than the resulting entity.  A.R. at 173-74.  The Board said this view was also supported by the regulation's history, by agency materials such as the Medicare Interpretive Manual, and by written interpretations from agency officials.  With respect to the intermediary's contention that the loss was not allowable because the transaction was not a bona fide sale with arms-length bargaining, the PRRB said imposition of such a requirement was not only impracticable but was also unsupported by the consolidation regulation or the Agency's prior interpretations.  The Board acknowledged it had been reversed by the CMS Administrator on this question in a nearly-identical prior case, but it said the language of the consolidation regulation "severely limits the application of the related party regulations to consolidations." *Id*. at 176.  The Board rejected the intermediary's contention that the absence of a specific provision allowing gains and losses from consolidations (in contrast to the express provision allowing gains and losses from mergers) precluded recognition of the loss.  Although such an interpretation was plausible, the PRRB said,

14

the contrary interpretation was also reasonable, and the agency's interpretive guidelines in the Medicare Intermediary Manual included an example showing recognition of gains or losses upon consolidation of two unrelated corporations who combine to form a new entity. *Citing* CMS Pub. 13-4 § 4502.7. The Board also cited the two informal opinion letters previously mentioned (one in 1987 and one in 1994) from agency officials adopting the view that gains or losses would be recognized in a consolidation transaction, with the assumption of liabilities by the consolidated entity representing consideration given for the assets. Although the Board acknowledged there was no "disposition" of assets in this transaction within the meaning of § 413.134(f), it said the language of the consolidation regulation "insulates the principles concerning 'bona fide' and 'arms length bargaining' to the relationship between the consolidating hospitals and their successor." A.R. at 180. It also said the Agency's long-standing application of the regulation to transactions involving non-profit providers meant there was "no authority in the regulation or the guidelines in effect at the time of the transaction to permit motivations unique to non-profits to be a determining factor in the reimbursement treatment." *Id*. In sum, the Board found that the intermediary's disallowance of the claimed loss was contrary to § 413.134(l)(3)(i), and it reversed and remanded the matter to the intermediary for calculation of the loss.

D.  Review by the Administrator of the Centers for Medicare & Medicaid Services (CMS).

Pursuant to 42 U.S.C. § 1395oo(f), the Administrator of the CMS elected to review the Board's ruling. In its summary of Medicare law and policy, the Administrator reviewed, among other things, Program Memorandum (PM) A-00-76, issued by the CMS on October 19, 2000 as a "clarification" of § 413.134(l). *See* A.R. at 15-18. Among other things, PM A-00-76 stated that § 413.134(l) applied to mergers and consolidations involving non-profit providers, but that "as with

transactions involving for-profit entities, in order for Medicare to recognize a gain or loss on the disposal of assets, the merger or consolidation must occur between or among parties that are not related ... and the transaction must involve one of the events described in 42 CFR 413.134(f) as triggering a gain or loss recognition by Medicare (typically, a *bona fide* sale, ... because a merger or consolidation could, but usually does not, involve a scrapping, demolition, abandonment, or involuntary conversion." A.R. at 1078B. The PM noted that mergers or consolidations involving non-profits, unlike those involving for-profit corporations, often involved a continuation in whole or in part of the governing board or management team of the former organization. In applying the "related organization" principle of 42 CFR 413.17, the Program Memorandum said consideration must be given to whether the composition of the new board includes significant representation from the previous board. If it does, then "no real change of control of assets has occurred and no gain or loss may be recognized as a result of the transaction." A.R. at 1078C. Thus, "[t]he fact that parties are unrelated before the transaction does not bar a related organization finding," and in fact "whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather, the focus of the inquiry should be whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them." *Id.* As for the requirement of a *bona fide* sale, the PM observed that non-profit mergers and consolidations were frequently based upon community interests that did not involve seeking fair market value for the provider's assets. The PM stated that no gain or loss could be recognized on such a transaction unless the transfer resulted from a *bona fide* sale as required by § 413.134(f) and as defined in the Provider Reimbursement Manual (104.24). According to the PM, this meant there must be "reasonable consideration" for the transfer, which required a comparison of the sale price with the fair market

value of the assets.  A large disparity between the two "indicates the lack of a *bona fide* sale."  A.R. at 1078E.

The Administrator concluded this interpretation of the "related organization" rule was consistent both with "early Medicare policy and the HCFAR 80-4 [a ruling by the Health Care Financing Administration]."  A.R. at 18.  It also found the interpretation to be consistent with the realities of a consolidation, because "the deal is initially between the consolidating entities," but they cease to exist and the transfer of assets is actually between the consolidating entities and the newly created corporation.   Thus, Medicare reasonably examines the relationship between the consolidating entities and the new corporation in determining whether there was a related party transaction.  *Id*.  The Administrator also cited the Intermediary Manual, and noted that although it permitted the revaluation of assets affected by a corporate consolidation between unrelated parties, it did not permit a revaluation of assets for a mere reorganization of  corporate structure.  *Id*. at 19. The Administrator said this dichotomy found further support in Generally Accepted Accounting Principles (GAAP), as expressed in Accounting Principles Bulletin (APB) No. 16, which recognized two approaches to the treatment of assets in business combinations: the "pooling method," applicable when there was a continuation of former ownership, and the "purchase method," applicable when the assets were acquired by new ownership.  Under APB No. 16, the Administrator said, transactions falling under the pooling method result in no revaluation of assets or recording of gains and losses because the combination is accomplished without disbursing resources of the constituents and ownership interests continue.  In a "new ownership" transaction, however, gains and losses are recorded.  *Id*. at 20.  The Administrator said that under the Intermediary Manual, intermediaries were to refer to GAAP (including APB No. 16) when Medicare instructions were

17

silent as to the valuation of consideration given in an acquisition. *Id*. at 19.  The Administrator also noted that a similar rule applied under the Internal Revenue Code.

After reviewing these Medicare policies generally, the Administrator set forth Findings of Fact and Conclusions of Law.  The findings included a review of the corporate structures of St. Joseph and St. Francis hospitals, as well a review of the consolidation agreement and the resulting Via Christi structure.  The Administrator concluded that "the transaction involved a related party transaction because of the relationship between the Provider [St. Joseph] and the consolidated hospital."  A.R. at 25.  Among other things, the Administrator cited the following factors:

-the Sisters of St. Joseph of Wichita, the sponsoring corporation of the provider, was one of two voting members of the new parent corporation of the post-consolidation hospital;

-although the Sisters of St. Joseph had diluted their voting powers by 50% as a result of the transaction (it was now one of two members rather than the sole member), after the consolidation they had 50% voting power affecting the combined assets of the two hospitals, "which the Administrator finds comparable to its pre-consolidation powers";

-Via Christi's governing board included 7 members from St. Joseph's board, 6 members from St. Francis's board, and 10 new members, for a total of 23 members.  The Administrator concluded "that a significant number of the members of [St. Joseph's] board were appointed to the new governing board" and St. Joseph and its sponsor "retained and continued to have a significant control of its asset."  The Administrator found that the "1/3 to 1/4 post-consolidation control" by St. Joseph principals was "comparable to the pre-consolidation control" and "represented a continuing significant interest when measured in proportional [sic] to the combined assets of the hospitals." A.R. at 26.  More importantly, the Administrator found, was that the pre-consolidation sponsor of

St. Joseph was one of only two members of the post-consolidation parent Via Christi, and under Via Christi's by-laws "the sponsors through the parent Via Christi had control over ... the appointment and removal of Board members." *Id.*

These facts, the Administrator found, showed "continuity of control between the Provider hospital [St. Joseph], the related party parent and sponsoring corporation and the post-consolidation hospital, related party parent and sponsoring corporation." *Id.* at 27. In light of this "relatedness of the Provider and the consolidated hospital," the transferor of the assets was "in essence" the transferee, and the parties were related within the meaning of § 413.17 such that a loss on the disposal of assets could not be recognized. *Id.* In other words, "the constituent corporations' same interests have been but recast in a different form only" and no loss has actually been incurred. *Id.* The Administrator said that Medicare rules, like the IRS rules, treat a transaction as a reorganization (with no recognized gain or loss) -- regardless of how the transaction is characterized -- whenever there is a continuity of interest or control between the constituent corporations and the new corporation. *Id.* at 28.

The Administrator also found that the *bona fide* sale requirement of subsection (f) must be applied to determine gain or loss on the consolidation, because paragraph [l] was "drafted specifically to address the revaluation of assets for proprietary corporations that consolidate, while paragraph (f) specifically addresses circumstances under which a gain or loss will be recognized." A.R. at 29. According to the Administrator, paragraph (l) "did not modify or limit the general related party rules at § 413.17 and does not address or modify the criteria for the recognition of gains and losses at paragraph § 413.134(f)." *Id.* The Administrator found that the transfer of St. Joseph's assets did not constitute a *bona fide* sale

because "there is no evidence in the record of arm's length bargaining, nor an attempt to maximize any sale price as would be expected in an arm's length transaction." *Id*. at 30. Moreover, an exchange of assets with a book value of $47 million for consideration of $11 million "indicates the lack of a bona fide sale or transaction." *Id*. at 31. In sum, the Administrator concluded that no loss could be recognized because the transaction was between related parties and did not constitute a *bona fide* sale.

II. *Standard of Review*.

Plaintiff Via Christi, as the successor to St. Joseph, argues that the Administrator's decision was contrary to Medicare regulations and long-standing interpretations of the regulations requiring recognition of any gain or loss incurred in a consolidation when the consolidating parties are unrelated to each other. The court's review of the Secretary's determination is governed by the Administrative Procedure Act ("APA"). Under the APA, the court may set aside the agency's action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The party challenging an agency action bears the burden of proving that it was arbitrary and capricious. *Angel v. Butz*, 487 F.2d 260, 263 (10th Cir.1973).

When a court reviews an agency's construction of a statute which it administers, and Congress has not directly addressed the precise question at issue, the question for the court is whether the agency's determination is based on a permissible construction of the statute. *See Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). "The power of an administrative agency to administer a congressionally created ⋯ program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id*. at 843 *(quoting Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). The Supreme Court

has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.'" *Chevron*, 467 U.S. at 844.  If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id*. at 845.

This rule of deference also means the court must give substantial deference to an agency's interpretation of its own regulations.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  As the Court explained:

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose.  Rather, the agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'  In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." [cite omitted] This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." [cite omitted]

*Id*. at 512.  In applying this principle, the court must keep in mind that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the

statutory gap in reasonable fashion." *National Cable & Telecommunications Ass'n. v. Brand X Internet Serv.*, 162 L.Ed.2d 820, 837 (2005). "Filling these gaps ... involves difficult policy choices that agencies are better equipped to make than courts. *Id*. at 865-866. "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.* at 843-44.

Insofar as factual matters are concerned, "the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." *Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (*quoting Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560, 1575 (10th Cir.1994)). "Thus, agency action ... will be set aside as arbitrary unless it is supported by 'substantial evidence' in the administrative record." *Pennaco*, 377 F.3d at 1156. *See* 5 U.S.C. § 706(2)(E). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pennaco*, 377 F.3d at 1156. It generally requires more than a "mere scintilla" of evidence but something less than a preponderance. *Id*.

III.  *Discussion*.

A.  Denial of Reimbursement due to consolidation between related parties.

As a prerequisite to reviewing the Secretary's "related party" determination, the court must address two ambiguities in 42 CFR § 413.134(l) (1995). The title of this provision -- "Transactions involving a provider's capital stock" --  might itself be sufficient to exclude the instant transaction from its scope, given that St. Joseph was a non-profit corporation that did not issue capital stock. Indeed the Secretary has asserted that the regulation was written to address only for-profit mergers and consolidations.  *See* A.R. at 1078C (Program Memorandum A-00-76). The Secretary has

22

consistently applied the provision to non-profit entities, however, and in PM A-00-76 the agency expressly concluded that the provision applies to non-profits corporations notwithstanding the absence of capital stock.  *See id.  See also* Doc. 16 at p. 11, n.1.  Because such a construction is not unreasonable or contrary to the purposes of the Medicare Act, the court assumes that subsection (l) applies to non-profit corporations held through membership interests rather than capital stock.  *Cf. Nat'l. Cable*, 162 L.Ed.2d at 843-44 (court must defer to the agency's construction if reasonable).

The second ambiguity concerns the absence in subsection (l)(3) of any reference to the realization of gains and losses.  This is in contrast to subsection (l)(2) on mergers, which explicitly states that realization of gains and losses is permissible.  Under the maxim of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another), and the principle that related provisions of a statute are to be construed together, this absence might well be construed to mean that loss may be recognized in a merger but not in a consolidation.  Again, however, the Secretary has construed the provision to authorize the realization of gains and losses in qualifying consolidations, and the court accepts that construction as a reasonable one within the Secretary's authority.  *See* A.R. at 1386 (Opinion Letter of HCFA Director of Division of Payment and Reporting Policy, dated May 11, 1987).  *See also* Doc. 16 at 35.

The court thus turns to the Secretary's argument that in determining whether this consolidation is between related corporations, he appropriately compared the structure and control of St. Joseph hospital before the consolidation to the structure with the structure and control of Via Christi after the consolidation, and having done so, reasonably found the consolidation to be between related parties.  The Secretary's explanation for comparing the pre- and post-consolidation entities is certainly a reasonable one that is consistent with Congress's directive to reimburse

23

providers for reasonable costs actually incurred.  As explained in Program Memorandum A-00-76, in these circumstances it is a change of asset ownership that causes the provider to actually incur a gain or loss on the assets.  But a transaction that effectively allows the provider or the beneficial owner of the provider to maintain its influence or control over the assets can reasonably be viewed as something other than a true change of ownership, at least insofar as Medicare reimbursement is concerned.  When a provider claims to suffer a loss from the transfer of its assets to another entity, it is manifestly reasonable to compare the ownership or control of the transferors and the transferee entities to determine if there is a significant degree of overlap between them.  The agency is undoubtedly within its authority to find that a transfer of assets to an entity significantly controlled or influenced by the same persons or parties who owned or controlled the transferor entity does not constitute a change in ownership warranting recognition of a loss.  The Secretary's interpretation sensibly recognizes that a change of ownership in form may not constitute a change of ownership in substance.  For this reason, plaintiff's arguments that it was a legal impossibility for these two corporations to be related (because legally they did not exist at the same time), or that the continuing participation of St. Joseph's sponsor (the sole member of St. Joseph's corporate parent) in the new organization is irrelevant, are unavailing.  The Secretary was not prohibited from looking beyond the technical form of the parties or entities involved and assessing the practical effects of the transaction. Otherwise, providers could create "paper losses" and force Medicare to pay out millions of dollars simply by engaging in consolidations that amount to little more than a corporate restructuring.  Such a concern is particularly relevant to claims of loss from non-profit provider consolidations, according to the Secretary, because they frequently involve the continuation of the former governing board or management team and may be based on considerations unrelated to fair

market value.   A.R. at 1078C-D.   And under generally accepted accounting principles a consolidation may be treated as a continuation of the former ownership (the pooling method) or as a purchase of assets establishing new ownership (the purchase method).   A.R. at 19-20.   As explained in APB No. 16, a consolidation treated as a pooling of resources does not result in a loss because the combination is accomplished without disbursing resources of the constituents and the former ownership interests continue.   Given that a consolidation can fall anywhere on the spectrum from a complete change of ownership on the one hand, to little more than a corporate restructuring on the other, the Secretary's examination of the relationship between the provider and the post-transaction entity is a reasonable means of determining whether a loss was actually incurred.   Where the circumstances of the transaction show that the providers have in substance merely pooled their assets and will continue to have control or influence over the assets of the new entity, the Secretary is within his discretion in concluding that the provider has not actually realized a loss.   As the Administrator noted, that is precisely how these entities treated the transaction on their respective financial statements.

The problem here is with the defendant's insistence that this approach is required by the plain language of the regulations and that it has been consistently applied by the agency.   For example, the Secretary argues that subsection (l)(3), by explicitly incorporating Section 413.17, requires an examination of "the relationship of the parties both before, and resulting from, a transaction...."   Doc. 16 at 24-25.   But this is not the most natural reading of subsection (l)(3), which permits a gain/loss assessment under subsection (f) "if the consolidation is *between* two or more corporations that are unrelated (as specified in § 413.17)...."   (Emphasis added).   This language seems to require only an examination of whether the two (or more) consolidating corporations are

related to each other prior to the transaction; not whether they are related to the newly created entity. This approach is suggested by the ordinary meaning of a consolidation "between" corporations. This was a consolidation between St. Joseph and St. Francis, not between St. Joseph and Via Christi. Additionally, the record indicates that the Secretary previously understood this provision to require only that the consolidating corporations be unrelated. For example, when the provision was adopted, the agency explained that subsection (l)(3) permits revaluation of assets "if two or more unrelated corporations consolidate to form a new corporation...." 44 Fed.Reg. 6912, 6913 (Feb. 5, 1979).[2] The Medicare Intermediary Manual (MIM) in effect at the time of this transaction stated that Medicare policy permits a revaluation of assets "affected by corporate consolidations between unrelated parties." A.R. at 1782. The example given was that "Corporation A, the provider, and Corporation B (a non-provider) combine to form Corporation C, a new corporate provider. By law, Corporations A and B cease to exist. Corporations A and B were unrelated parties prior to the consolidation." *Id.* at 1783. According to the MIM, "[a] gain/loss to the seller (Corporation A) and revaluation of assets to the new provider (Corporation C) are computed." *Id.* This explanation clearly suggests that in a consolidation the related party requirement pertains only to the consolidating corporations -- Corporations A and B -- not to the newly created entity. The same

---

[2] The Secretary's concern over whether a *de jure* transfer of ownership is also a *de facto* transfer of control was not in evidence when subsection (l) was adopted. As the agency explained at that time: "With regard to statutory mergers, the new paragraph (l) provides that if the merger is between unrelated parties, the assets of the merged corporation may be revalued. This rule differs from the rule for provider stock transactions because, while the acquisition of capital stock does not affect the legal status of the corporation, in a merger, the merged corporation ceases to exist as a corporate entity. In a merger, the surviving corporation does not become a mere stockholder of the merged corporation but takes over the merged corporation entirely. *Since the merged corporation no longer exists, there has indeed been a transfer of ownership and revaluation is proper.*" 44 Fed.Reg. 6912, 6913 (Feb. 5, 1979) (emphasis added).

26

understanding of subsection (l)(3) was included in opinion letters issued by agency officials in 1987 and 1994.[3]

The record thus shows that the Secretary's present interpretation -- although a reasonable one -- represents a change from prior agency representations.  The question is whether it is arbitrary and capricious to apply this change to the instant transaction.  The court concludes that the Secretary's application of the new interpretation is not arbitrary and capricious.  As an initial matter, the Supreme Court has made clear that the mere fact of a change in agency interpretation, standing alone, does eliminate the deference owed by the court to the agency's determination:

> Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the Chevron framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act. * * * For if the agency adequately explains the reasons for a reversal of policy, "change is not invalidating, since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency." * * * "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency ⋯ must consider varying interpretations and the wisdom of its policy on a continuing basis," * * * for example, in response to changed factual circumstances, or a change in administrations,... That is no doubt why in Chevron itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy.

*National Cable & Telecomm. Ass'n. v. Brand X Internet Serv.*, 125 S.Ct. at 2699-2700 (citations omitted).  Secondly, the agency's present construction does not actually contradict the plain language of any applicable regulation.  Although the Secretary's position may not employ the most

---

[3] Although plaintiff repeatedly cites the opinion testimony of its expert witnesses (who were themselves former agency officials) to support its construction of the regulations, such testimony is of limited value in ascertaining the agency's official policy.  Although the testimony may be relevant to establishing the agency's practice, the personal opinion of such officials as to what the regulations were intended to mean or how they were intended to work does not bind the agency.

plausible reading of subsection (l)(3), nothing in that regulation -- or any other for that matter -- expressly precludes the Secretary's interpretation.  At the same time, the Secretary's construction has some express support in the related party rule of § 413.17 and in the gain/loss provisions of § 413.134(f), both of which the Secretary has now effectively construed as setting forth additional requirements for recognition of gain or loss above and beyond the requirements of subsection (l)(3). *See e.g.* 42 CFR 413.17(c)(2) ("If the provider obtains items ... from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself."); 42 CFR 413.134(f) (assets may be disposed of by sale; losses from "bona fide sale" are reimbursable).  It cannot be disputed that the agency has long had a policy limiting reimbursement for costs incurred through a related provider, and that it has considered parties to be related if one controls or influences the other "even though it is a separate legal entity." § 413.17(c)(2).  *See also* HCFA Ruling 80-4 ("[a]pplicability of the related organization rule which limits costs of a provider to those of its supplier is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although this factor is to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract.").  No showing has been made that the Secretary's interpretation as to how these regulatory provisions interact with each other is contrary to any established rule or law.  And although the Secretary's current interpretation varies from what agency officials indicated in instruction manuals and opinion letters, materials such as these do not have the force of law and are entitled to deference only according to their degree of persuasiveness. *See e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Smiley v. Citibank, N.A.*, 517 U.S. 735, 742 (1996) (doubting whether opinion letter of

agency official was sufficient to establish binding agency policy).  Finally, given the Secretary's explanation that the modification was necessitated by changing circumstances -- such as the increasing frequency of non-profit consolidations under a rule aimed at for-profit corporations, the tendency of non-profit providers to engage in "pooling" type consolidations with continuing influence or control over the assets, and a recognition that non-profit mergers were being undertaken without any consideration of fair market value -- it was not arbitrary or capricious for the Secretary to reconsider its prior interpretation of the regulations and to take these changing circumstances into account.

The court notes that while "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," *Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006),  a "[s]udden or unexplained change or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion." *Id*.  The change in this instance, however, has been explained by the agency and supported by a showing that changed or unanticipated circumstances required clarification of existing regulations.  Moreover, there is no question that the parties to the consolidation were aware prior to the transaction that the agency might interpret the regulations to disallow a loss if it were determined that St. Joseph was related to the new entity.  The record shows they were informed by an agency official from whom they sought an opinion that it was necessary to compare the composition of the new board with the boards of the consolidating hospitals, and  "if the board of directors of Hospital A or Hospital B have significant influence or control over Hospital C [the new entity], then Hospital A or B would be determined to be related to Hospital C."  A.R. at 1818.  The agency official further informed them it was uncertain what percentage of board members it would take to qualify as significant control

or influence, but that a new board with one-third of its members from the board of a consolidating hospital could constitute significant control or influence.  Plaintiff's actual notice of the standard later applied by the agency weighs against any contention that the determination was arbitrary or capricious or a deprivation of due process.  *Cf. Baptist Health*, 458 F.3d at 777 (change was not arbitrary and capricious where agency notified parties beforehand they did not meet regulatory requirements for reimbursement).

Plaintiff raises a number of challenges to the agency's modified interpretation, including that it:  constitutes an impermissible new rule in violation of the Medicare Act; it is a new rule subject to the requirements of the Administrative Procedures Act; it constitutes prohibited retroactive rule making   contrary to the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Congressional Review Act"); and it violated St. Joseph Medical Center's constitutional rights by taking property without compensation and by discriminating against non-profit corporations and providers with religious sponsors.  None of the arguments, however, invalidates the Secretary's determination.  As for the Medicare Act's requirement that the regulations provide for recapture of depreciation in the same manner provided under 1984 regulations, that provision by its terms would apply only to a dispute involving recapture of depreciation by Medicare, something not at issue here. As for the contention that the agency should have submitted its "related party" interpretation for notice and comment and/or  publication, the court agrees with defendant that this determination was not subject to the procedural requirements of the APA (or the Medicare Act) because it constituted an interpretation or clarification of existing regulations rather than enactment of a new rule.  *See Lehigh Valley Hospital- Muhlenberg*, 2006 WL 2547061 (E.D. Pa., Aug. 31, 2006).   *See also Shalala v. Guernsey Mem. Hospital*, 514 U.S. 87, 99-100 (1995) (interpretive rules do not require

notice and comment under the APA).  This is true notwithstanding that the agency's interpretation was at variance from prior indications of agency intent.  Although the Tenth Circuit has endorsed a fairly broad standard for when rulemaking is required -- including when there is a change in "existing law, policy, or practice" (*Rocky Mtn. Helicopters, Inc. v. Fed. Aviation Admin.*, 971 F.2d 544, 547 (10th Cir. 1992) -- the court is aware of no Tenth Circuit authority requiring application of that standard to changes affecting only agency instruction manuals or opinion letters, which do not have the force of law and which themselves were not subjected to notice and comment.  *Cf. Reno v. Koray*, 515 U.S. 50, (1995) (agency internal guideline was akin to interpretive rule that does not require notice and comment).  *See also Mission Group Kansas, Inc. v. Riley*, 146 F.3d 775, 782 (10th Cir. 1998) (the dispositive question is whether the agency's determination is a new rule or an interpretation of an existing rule). Because the agency's determination amounts to a clarification of existing regulations, rather than a change in the regulations, it is not subject to the notice and comment provisions of the APA.  That fact also precludes plaintiff's argument under the Congressional Review Act as well, which employs a similar definition of "rule" in its requirements. *See* 5 U.S.C. § 804(3).  Nor does the agency's interpretation unlawfully discriminate against non-profit entities, as plaintiff contends.  The need for clarification may have been prompted by factors relating primarily to non-profit corporations, but the standards applied by the agency are in fact neutral and apply to non-profits and for-profit corporations alike.  In sum, the court concludes it was not arbitrary or capricious or otherwise contrary to law for the agency to conclude that the related party rule should be applied to the entire transaction -- including to St. Joseph and Via Christi -- in determining whether St. Joseph incurred a loss from the transfer of its assets to Via Christi.

Having determined that it was not arbitrary or capricious for the agency to apply such a rule,

31

the court turns to plaintiff's argument that the Secretary erroneously found that St. Joseph in fact had significant influence or control over Via Christi after the consolidation.   Under the applicable standard of review, the court must uphold the agency's determination on this factual issue if it is supported by substantial evidence.   The related party rule provides in part that control exists "if an individual or organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization...."  42 CFR 413.17(b)(3).   After reviewing the record the court concludes the agency's finding of significant control or influence by St. Joseph or its principals is supported by substantial evidence.   Among other things, seven of the twenty-three person board of directors of Via Christi came from the St. Joseph organization.   Although the control or influence of these board members was clearly less after the consolidation than it was before, still it would not be unreasonable to find that they possessed the power at least indirectly to significantly influence the actions or policies of Via Christi.   The Administrator also noted that a number of significant operational positions in Via Christi were filled with former St. Joseph officers, including the President and CEO of Via Christi. More importantly, according to the Administrator, as one of only two members of the post-consolidation parent Via Christi Health System, the Sisters of St. Joseph (the sole member of CSJ) maintained a significant ability to influence or control the actions or policies of Via Christi, such as through the exercise of reserve powers that were similar to those held prior to the transaction, including the ability to appoint and remove board members.   Taken as a whole, the record provides substantial evidence to support the Secretary's finding that the provider St. Joseph maintained the power to significantly influence or control the actions or policies of Via Christi, such that the transfer of assets could be considered to be between related organizations.

    B.  Denial of Reimbursement due to lack of bona fide sale.

Plaintiff next challenges the Administrator's rejection of St. Joseph's claim on the grounds that it did not constitute a bona fide sale. Plaintiff argues this was error because the regulation relied upon by the Administrator "addresses only the 'bona fide sale or scrapping of depreciable assets' and has no application in this case." Doc. 13 at 25. Plaintiff argues that a consolidation cannot constitute a "sale" -- in part because there is no co-existing "buyer" and "seller." It argues the agency has always recognized the distinction between a sale and a consolidation, and that it has historically allowed reimbursement for loss in a consolidation so long as the consolidating entities were unrelated.

There is strong support in the regulations for the Administrator's finding that recognition of loss in a consolidation transaction requires a showing of a bona fide sale. Section 413.134(l)(2), dealing with statutory mergers, provides in part that "[i]f the merged corporation was a provider before the merger, *then it is subject to the provisions of paragraph[] ... (f) of this section concerning ... the realization of gains and losses.*" Subsection (l)(3) on consolidations does not actually contain this same provision, but the agency has construed subsection (l)(3) as though it did. Notably, this provision does not state that gains and losses shall be recognized upon a merger (or consolidation) between unrelated parties; rather, it states that the provider is *subject to the provisions of paragraph (f)* concerning realization of gains and losses. Paragraph (f), in turn, does not permit realization of all purported gains and losses. It provides a list of transactions constituting "disposal" of depreciable assets -- including bona fide sale, exchange, and abandonment -- and says that the treatment of the gain or loss depends upon the manner of disposition of the asset as provided in paragraphs (f)(2) through (f)(6). The plain import of these provisions is that a provider must meet the standards for allowable costs in one of the paragraphs in (f)(2) through (6). For example, if the

33

provider transferred the assets pursuant to a consolidation and no consideration was received for the transfer, the transfer would likely be considered a "donation" under subsection (f)(4) and no loss would be recognized by Medicare.  § 413.134(f)(4).  On the other hand, a loss would be recognized if the transfer constituted a "bona fide sale."  § 413.134(f)(2).  The Secretary's interpretation of the consolidation provision to require a showing of a bona fide sale for a loss to be reimbursed is, in the court's view, an entirely reasonable construction of the regulations.

In finding this transaction did not constitute a bona fide sale, the Administrator employed a provision of the Provider Reimbursement Manual which states: "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration.  An arm's length transaction is ... negotiated by unrelated parties, each acting in its own self interest."  A.R. at 12.  The Secretary modified the PRM to include this provision in the year 2000, describing it as a clarification of the requirement of a bona fide sale.

Plaintiff argues that prior to this transaction the agency -- in both opinion letters and the MIM -- did not require consolidation transactions to satisfy any bona fide sale standard.  Plaintiff also argues that its expert testimony showed there could be no sale transaction in a consolidation. It also contends that to the extent the agency had previously defined a "bona fide sale," it required only that the two parties to the consolidation transaction be unrelated and that "valuable consideration" be given for the assets.

The court finds it was not arbitrary or capricious for the agency to view this transfer of assets through the lens of a sale.  Regardless of the fact that the St. Joseph and Via Christi corporate entities did not negotiate with each other to establish terms of exchange, the transaction was in all

practical respects analogous to a sale between the two, with title to the assets of St. Joseph transferred to Via Christi in exchange for Via Christi's assumption of St. Joseph's liabilities.  Nor does the court find anything arbitrary or capricious about the agency's employment of the above definition of "bona fide sale" in assessing whether St. Joseph realized a loss on the transaction.  For reasons similar to those expressed previously pertaining to the related party rule, the court finds the Secretary was within his discretion in modifying the agency's prior construction of the bona fide sale requirement.  Again, nothing in the Secretary's definition contradicts prior established law, and the definition employed here was clearly consistent with the then-existing regulations and the Medicare Act and its purposes.   The Secretary has adequately explained why the clarification of the bona fide sale requirement was necessary given the circumstances being confronted by the agency, which included a large number of non-profit hospitals disposing of assets in mergers and consolidations undertaken without regard to considerations of fair market value.  The Secretary was under a statutory obligation to reimburse providers only for reasonable costs incurred in providing Medicare services, and the requirements adopted by the Secretary were a reasonable and lawful means of complying with that obligation.

Finally, the court finds that the Administrator's determination that this transaction was not a bona fide sale is supported by substantial evidence.  Most significant in this regard is the undisputed evidence that in disposing of its assets St. Joseph was unconcerned with obtaining fair market value in return.  In the administrative proceedings St. Joseph failed to establish that the consideration it received bore any reasonable relationship to the fair market value of the assets transferred.  As the Administrator noted, transferring assets with a book value of $47 million in exchange for consideration of $11 million is sufficient -- at least in the absent any evidence of fair

market value -- to indicate that the consideration was not reasonable and that the parties were not each acting in their own economic self-interest.  This is certainly not meant to impugn the integrity or motives of either party to the consolidation or to suggest that St. Joseph was acting in bad faith.  On the contrary, St. Joseph's motivation appears to have been entirely appropriate to its mission and undertaken in the spirit of furthering its service to the community.  In that sense it was a selfless act.  But the test for obtaining reimbursement under Medicare, as interpreted by the Secretary, requires parties disposing of assets to seek reasonable consideration in exchange for the assets.  That is a reasonable requirement meant to further Medicare's obligation to pay only for the reasonable costs incurred in providing Medicare services.  To the extent a provider may be willing to transfer assets without seeking fair market value in return, it effectively donates to the recipient the difference between fair market value and the consideration actually received.  Nothing in the Medicare Act or the regulations requires the Secretary to pay for such a donation.  In sum, the Secretary's determination that the transfer of St. Joseph's assets did not constitute a bona fide sale is supported by substantial evidence in the record.

IV.  *Conclusion*.

Plaintiff Via Christi's Motion for Summary Judgment (Doc. 12) is DENIED.  Defendant Secretary of Health and Human Services' Motion for Summary Judgment (Doc. 15) is GRANTED.  The decision of the Secretary denying St. Joseph Medical Center's loss claim is AFFIRMED.  The clerk of the court is directed to enter judgment accordingly.  IT IS SO ORDERED this  25th   Day of September, 2006, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge

36